# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**STEPHEN STOVALL,**

**Plaintiff,**

**-vs-**                                                     **Case No.  6:11-cv-941-Orl-28DAB**

**MRS BPO, LLC,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

> This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION FOR SANCTIONS (Doc. No. 123)** |
| **FILED:** | **March 26, 2013** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED** in part.

In this Fair Debt Collection Practices Act ("FDCPA") case, Plaintiff Stephen Stovall sued Defendant MRS BPO, LLC ("MRS"), a debt collector who contacted him and left him several voice messages while attempting to collect a student loan debt of approximately $37,000.  *See* Doc. 77. Judge Antoon denied the summary judgment motion of MRS and the case went to trial by jury on January 28 and 29, 2013.  Docs. 104, 105.  After several claims were withdrawn by Plaintiff on the second day of trial, the jury returned a verdict for MRS.  Doc. 122.  Shortly thereafter, MRS filed its Motion for Sanctions, contending that sanctions should be awarded for the bad faith behavior of Plaintiff and his counsel, Alex Weisberg, Esq., because Plaintiff had allegedly committed perjury multiple times at trial.  Doc. 123.

### I. Background Facts

On January 27, 2011, non-party Educational Resources Institute engaged MRS to collect a student loan debt of approximately $37,000 from Stovall, who had co-signed the loan. (April 25, 2012 Perkins Decl., Doc. 39-14). While attempting to collect the debt, MRS made telephone calls to Stovall and left him a number of voicemail messages.

On March 19, 2011, Plaintiff's counsel, Alex Weisberg, Esq., of the law firm of Weisberg & Meyers, sent a demand letter to MRS seeking payment in connection with alleged FDCPA and Florida Consumer Collection Practices Act ("FCCPA") violations.  Plaintiff sought a settlement well in excess of the $1,000 in statutory damages available under the FDCPA, contending that Plaintiff had incurred considerable "emotional distress" damages.  MRS advised that it believed the demand was too high, and counter-offered what it felt was a more reasonable figure, which was rejected by Stovall. Doc. 123-1, Salvo Decl.

On June 6, 2011, Stovall filed suit in this Court alleging that the MRS communications violated provisions of the FDCPA and the FCCPA.  Doc. 1. Stovall asserted six counts under the FDCPA and FCCPA, divided into two categories: three harassment counts and three voicemail counts. Plaintiff alleged in Count I that he was called repeatedly at work even after informing MRS that he was not allowed to take personal calls at work. 15 U.S.C. §1692c(a)(3) of the FDCPA.  Plaintiff alleged in Counts II and VI that MRS had called him frequently at work with the intent to harass him in violation of 15 U.S.C. §1692d(5) and the FCCPA, Fla. Stat. §559.72. (collectively the "Harassment Counts").

The other three Counts (Counts III, IV, and V) arose out of voicemails the MRS collector left for Plaintiff which allegedly did not disclose the collector's individual identity, MRS's corporate identity, and that the voicemail messages were from a debt collection agency. 15 U.S.C. §§ 1692d(6), § 1692e(ii) (collectively the "Voicemail Counts"). On August 11, 2011, Defendant filed its Answer

to the Complaint, denying all allegations and asserting a bona fide error defense to the Voicemail Counts. MRS also denied that it had ever spoken directly to Plaintiff and that Plaintiff had ever informed MRS that he was not allowed to receive personal telephone calls at work.  Both parties filed motions for summary judgment, which Judge Antoon denied, and the matter was set for trial.

At the jury trial, only the Voicemail Counts went to the jury because, just before closing arguments, Stovall dismissed the Harassment Counts; Plaintiff's conduct leading up to the withdrawal of those counts is the subject of the instant Motion for Sanctions.  The jury found in favor of MRS on the Voicemail Counts.  At the close of trial, Judge Antoon reserved judgment on the imposition of sanctions and referred the matter to the undersigned Magistrate Judge for an evidentiary hearing. Doc. 105.  On March 11, 2013, final judgment was entered by the Court in favor of MRS, awarding MRS its costs.  On June 18, 2013, the Court held an evidentiary hearing at which Stovall and his trial counsel, Alex Weisberg, Esq., testified.  *See* Doc. 154.

## II.  Standard for Sanctions

MRS alleges that the Court should award sanctions against Stovall under the Court's inherent authority to award sanctions.  MRS further alleges that the Court should also award sanctions against Plaintiff's attorney, Alex Weisberg, Esq., pursuant to the Court's inherent power and under 28 U.S.C. § 1927 for vexatiously and unreasonably multiplying the proceedings.

### A.  Inherent Power

The court has inherent power to manage the orderly and efficient disposition of the cases before it, which includes the authority to impose "reasonable and appropriate" sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332 (11th Cir. 2002) (citing *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir. 1993)). This "inherent power . . . can be invoked even if procedural rules exist which sanction the same conduct." *Id*. at 49, 111 S. Ct. at 2135.  The District Court's inherent power should be exercised

with caution and its invocation requires a finding of bad faith. *Id*. at 50, 111 S. Ct. at 2136; *see also In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) ("Invocation of a court's inherent power requires a finding of bad faith."). In exercising its inherent power to impose sanctions, a court must "comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers*, 501 U.S. at 50, 111 S. Ct. at 2136.

The individual to be sanctioned must be given due process which means that the individual must, first, be afforded "fair notice that his conduct may warrant sanctions and the reasons why," and, second, "be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions." *Mroz*, 65 F.3d at 1575–76 (citing *Donaldson v. Clark*, 819 F.2d 1551, 1559–60 (11th Cir. 1987)). The inherent power is to be used to fashion an "appropriate sanction." *Chambers*, 501 U.S. at 44, 111 S. Ct. at 2133; *see also Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) (noting that a court's inherent authority "includes the authority to impose 'reasonable and appropriate' sanctions." (citing *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1545 (11th Cir. 1993))).

Several Federal Rules of Civil Procedure authorize sanctions in the form of attorney's fees for lawyer misconduct: Rule 11 (certification requirement for papers), Rule 16(f) (pretrial conferences), Rule 26(g) (certification requirement for discovery requests), Rule 30(g) (oral deposition), Rule 37 (failure to cooperate with discovery), Rule 56(g) (affidavits accompanying summary judgment motions); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 n.8, 111 S. Ct. 2123, 2131 n.8, 115 L. Ed. 2d 27 (1991). "Although they differ by context, [these] sanctioning mechanisms are similar in that they are all rooted in the same basic goals—protecting the court and the public from litigation which impedes the administration of justice." *Byrne v. Nezhat*, 261 F.3d 1075, 1131 n. 110 (11th Cir. 2001) *abrogated on other grounds by Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146 (11th Cir.2011).

**B. Section 1927**

MRS also seeks sanction against Attorney Weisberg under 28 U.S.C. § 1927 for vexatiously and unreasonable multiplied the proceedings.  Section 1927's purpose is to "deter frivolous litigation and abusive practices by litigants and to ensure that those who create unnecessary costs bear them." *Smartt v. First Union Nat'l Bank*, 245 F.Supp.2d 1229, 1234-35 (M.D. Fla. 2003) (citing *O'Rear v. Am. Family Life Assurance Co. of Columbus, Inc.*, 144 F.R.D. 410, 413 (M.D. Fla. 1992)). Title 28 U.S.C. § 1927 reads:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C.A. § 1927.  In order to justify an imposition of sanctions under this section, three requirements must be observed: 1) an attorney must engage in "unreasonable and vexatious" conduct; 2) such conduct must "multiply the proceedings;" and 3) the amount of the sanctions cannot exceed the costs incurred due to the conduct.  *Jerelds v. City of Orlando,* 194 F. Supp. 2d 1305, 1312 (M.D. Fla. 2002) (citing *McMahan v. Toto,* 256 F. 3d 1120, 1128 (11th Cir. 2001)).  The meaning of "unreasonable and vexatious" is subject to interpretation[1] but "at [a] minimum . . . merely unintended, inadvertent, and negligent acts will not support the imposition of sanctions under § 1927; [r]ather, the power to impose sanctions under § 1927 should be exercised 'only in instances of a serious and studied disregard for the orderly processes of justice.'" *Jerelds*, 194 F. Supp. 2d at 1312 (internal citations omitted). "Black's Law Dictionary defines the term 'vexatious' to mean 'without reasonable or probable cause or excuse; harassing; annoying.'  It further defines 'vexatious suit' to mean a 'lawsuit instituted maliciously and without good cause.'" *Smartt v. First Union National Bank*, 245 F.Supp.2d 1229, 1234-35 (M.D. Fla. 2003).  Section 1927 "does not require a specific finding that counsel acted in, or engaged in, conduct tantamount to, bad faith." *Cordoba v. Dillards, Inc.*, 419 F.3d

---

[1]*See Jerelds, supra*, collecting cases.

1169, 1178 n.6 (11th Cir. 2005).  When counsel "knowingly or recklessly pursues a frivolous claim," the district court may order sanctions under § 1927.  *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1241 (11th Cir. 2007). "Objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently;" an attorney's conduct is "tantamount to bad faith" when he "either carelessly or deliberately" covers up evidence. *Id.* (citing *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544 (11th Cir. 1993)).  When an attorney has "unreasonably and vexatiously" multiplied the proceedings, the attorney must be required to personally satisfy the fees incurred by such conduct. *Dictiomatic, Inc. v. United States Fidelity & Guaranty Company*, 127 F.Supp.2d 1239, 1247 (S.D. Fla. 1999).

### III. *Analysis*

MRS argues that this case is "one of those unusual ones where sanctions are warranted due to the bad faith behavior of Plaintiff Stephen Stovall and his counsel, Alex Weisberg."  Doc. 123.  MRS alleges that Plaintiff committed perjury multiple times at trial, directly contradicted his previous deposition testimony over and over again, and blatantly lied that a particular telephone number was not listed on the website of a company he partially owned.  Doc. 123.  MRS also argues that Plaintiff altered a key document produced in discovery by removing information that was damaging to his claims, and his demeanor throughout cross-examination was that of a liar, in that "he stuttered, stammered and was sometimes rendered speechless."  Doc. 123.

Plaintiff responds that the Court should not invoke its inherent authority to sanction him because the statements at issue were not made in bad faith – or to "defile the temple of justice" – as required to meet the high standard necessary to impose sanctions.[2]  He argues that he was simply

---

[2]Plaintiff argues the Motion is essentially one for attorney's fees and under the American Rule, there is no statutory to be fees should not be awarded to MRS in this case.  Doc. 147 at 2 (citing *Aleyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975)).  He also argues that fees can not be awarded pursuant to the FDCPA, because §1692K(a)(3) allows a successful defendant to recover fees only when the court finds that the plaintiff brought the action in bad faith and for purposes of harassment, and there is no such allegation here.  Plaintiff also contends that, if viewed as a motion for attorney's fees, under Fed. R. Civ. P. 54(d), the Motion was untimely when filed 15 days after entry

mistaken on several issues, and when confronted with the correct information during a skillful cross-examination, he readily admitted that he could be mistaken.  He also argues that he was not trying to do anything sinister, and the Court previously declined to order sanctions, even though MRS moved for them, when Plaintiff was ordered to produce the unredacted list.

Plaintiff's trial attorney[3], Alex Weisberg, responds that he should not be sanctioned for suborning perjury because a close review of the record of the proceedings confirms that he did not elicit testimony from Plaintiff at trial that Plaintiff did not believe to be true, and MRS has failed to establish that Plaintiff's allegedly perjured testimony regarding the putative 2010 events was material. He also argues that no calls from Plaintiff *to his attorneys* were blocked out by Plaintiff in the February 2012 version of the telephone log he constructed.  Weisberg further argues that after Judge Antoon denied summary judgment on Plaintiff's Harassment Counts, he had no reason to doubt that the Court considered these claims non-frivolous and legally reasonable prior to the trial.

The conduct at issue can be divided into three categories: (1) Plaintiff's original assertion of certain events happening in 2010 which could not have been related to MRS' collection efforts, since it was undisputed that MRS did not contact Plaintiff before January of 2011; (2) Plaintiff's redaction of certain phone numbers on a phone log he produced, without any notice to the opposing party that it was redacted; (3) Plaintiff's testimony regarding the alleged "work" telephone number MRS called, which was subsequently listed on a website affiliated with a company Plaintiff partially owned.  The Court addresses each type of conduct in turn.

A. **Plaintiff's allegations of certain events in 2010 related to MRS conduct**

_____

of judgment.  Because the Motion was clearly filed as one for Sanctions under the Court's inherent authority, these arguments are without merit.

[3]Plaintiff retained new, separate counsel for purposes of defending the Motion for Sanctions.

At Stovall's deposition[4] on April 16, 2012, he testified that at the time MRS first began calling him, he worked in Iraq for a company called Dyncorp; however, he was also doing remote consulting work for a South Sudanese company called Africa OMS. Doc. 123-2, Stovall Dep. at 16, 23. Stovall testified that, in 2010, a secretary at Africa OMS told him that he had been receiving telephone calls from an unknown party on one of Africa OMS's telephone numbers: (281) 506-2877 (the "Telephone Number"). Doc. 123-2, Stovall Dep. at 18. Stovall testified that he decided to "take over control of that number and where it was routed . . . I changed the routing of the phone to me, to where I was, to my location so I could . . . understand what the secretary was talking about." Doc. 123-2, Stovall Dep. at 18-19. "The plan was to transfer the phone back to the Africa OMS secretary," after he figured out who was calling him on the Telephone Number. Doc. 123-2, Stovall Dep. at 26. Later in the deposition, he subsequently admitted he had not transferred the Telephone Number back to Africa OMS because the owner of the company (Mr. Dup) had died in February or March 2011 and the company's "ability to function ceased." Doc. 123-2, Stovall Dep. at 26[5].

In support of its sanctions argument, MRS points to Stovall's deposition testimony that the calls from MRS to the Telephone Number started in 2010. Stovall subsequently testified that, after re-routing the Telephone Number to himself, he spoke to an MRS collector in 2010 – that "the phone calls were far back in 2010." Doc. 123-2, Stovall Dep. at 27-29. Once counsel for MRS pointed out to Stovall at the deposition that his account had not even been placed with MRS for collection until January 27, 2011, Stovall's response was that he was "surprised" by this information Doc. 123-2, Stovall Dep. at 54.

---

[4]MRS took Plaintiff's deposition on April 16, 2012 via telephone based on Stovall's representation that he worked in the Republic of South Sudan and could not be present in person.

[5]MRS also notes that, although Stovall clearly testified that Africa OMS was out of business, he also testified, at another point in the deposition, that he was not sure what Africa OMS was doing currently because "I'm not with them, at this time, I'm not sure what they do now." Doc. 123-2, Stovall Dep. at 16.

As to the sanctions for this testimony, Stovall argues that he "did not lie," but instead believed when his deposition began that he had received calls from MRS beginning in 2010, until counsel for MRS pointed out MRS did not have the file until 2011, and at that point he readily admitted he could be mistaken about the year.  He argues that, at trial, he testified that he could not be certain that the 2010 earlier calls were from MRS.  Stovall concedes that he testified during his deposition: "The conversation, for me, would have been probably around August, maybe September 2010, it might have been a little bit later than that, I'm not absolutely positive of the time period that I actually had my first actual conversation with somebody."  Doc. 123-2, Stovall Dep. at 10.  He argues that when he was confronted with the information that his account was not placed with MRS until January 27, 2011 (Dep. at 54) and asked if he would be surprised to learn it was not with MRS until 2011, he did not challenge counsel's statement, but instead, said, "Yes, it would [surprise him]"; however, he did challenge the truth of her statement.

Plaintiff also argues that when asked if, "[I]s it possible it was a collection agency other than MRS in 2010 . . . , since MRS didn't even have your file until the end of January 2011?" he responded, "You know, that would be speculation on my part, because the only debt that would be outstanding that I know of is the one that you guys, your company that you're represented are pursuing, so I don't know who else would call for it."  Doc. 123-2, Stovall Dep. at 54-55.  Plaintiff argues that he was not asked and he never testified that the caller identified himself as being with MRS.

As to the other deposition testimony that Stovall became aware of calls that were received by the secretary for Africa OMS in 2010 (Doc. 123-2, Stovall Dep. at 17-18), he argues that he was clearly talking about calls being received by the secretary, and he testified that the secretary did not know who was calling.  Doc. 123-2, Stovall Dep. at 27, 53-54,77-78.  When counsel for MRS asked him if he had any way of knowing if the calls came from MRS, he argues his answer was that "he was not sure" the calls came from MRS.  Doc. 123-2, Stovall Dep. at 53-54.  He contends that, at trial, he

did not "try to defraud the court" and say the MRS calls started in 2010, but since counsel for MRS raised it in her cross-examination, he merely responded he "believed" the call he received in 2010 was from MRS. Doc. 123-19, Stovall Tr. at 50. Plaintiff contends that, at trial, Plaintiff limited his testimony to the calls made in 2011 that he was certain MRS had made, and counsel for MRS shrewdly used his prior testimony to impeach him as part of her skillful cross-examination. When asked when he learned about MRS during the trial, he responded by saying "that would have been February, 2011, for –for sure" (Doc. 123-19, Stovall Tr. at 14) in an effort to clarify "that he was referring to the first time that he was *sure* that MRS was involved was in 2011." Stovall argues that knowing the full extent of the deposition testimony, and his admitted uncertainty about the identity of the caller in 2010, it should be clear his testimony was not intended to be fraudulent.

MRS also argues that Stovall's Responses about whether and when he sought medical treatment were evasive, inconsistent, and vacillated between 2010 and 2011. During written discovery MRS asked Plaintiff to state whether he had seen a physician, a mental health specialist, or any other person regarding his emotional and/or mental anguish he claim to have suffered. Doc. 123, Ex. I, First Set of Interrogatories to Plaintiff, Request No. 21. Plaintiff responded, "None at this time. Investigation continues." Doc. 123, Ex. J. In its First Request for Production of Documents, MRS asked for documentation related to Stovall's emotional and/or mental anguish, including, but not limited to, health records, and Stovall's response was "None at present. Investigation continues." Doc. 123, Ex. K, Ex. L. Stovall supplemented his response to the Request for Production of Documents on March 15, 2012, stating:

> Plaintiff did go to medical while he was in Iraq to discuss issues he was having with regard to loss of sleep and other effects related to the phone calls he was receiving from Defendant. Plaintiff does not have a copy of the visit because he was in a place in which others required more attention and he felt that he should not burden the staff with his problems considering the context.

Doc. 123, Ex. M.  At Stovall's deposition on April 16, 2012, he testified that he saw the doctor in 2010. Stovall Dep. at 65. When asked if he had any documents memorializing his visit to the doctor he stated that he was given a receipt, but he had no idea where it was. Stovall Dep. at 65.  MRS argues that, at trial, Stovall changed his testimony and stated that he first saw the medic in March of 2011, with prompting from Mr. Weisberg on the revised date.  Doc. 123-19, Stovall Tr. at 140.

Stovall argues that his testimony made clear that MRS was only *partially* responsible for his sleep issues and MRS was not the sole reason that he sought medical care; he testified that he had "high-level indigestion and hemorrhoids." Doc. 123-20 at 64.  He contends that, at his deposition, he admitted "the medical visit was not focused on anything MRS caused" and argues in his Response that his "trial testimony was equally non-controversial." Doc. 147 (citing Doc. 123-21, Stovall Tr. at 86-88).  Stovall argued at the evidentiary hearing that he testified at trial it was *not* MRS who caused him to go to the doctor then, but other stressors.  Doc. 123, Ex. P, Stovall Tr. at 86-87.  The trial transcript shows that Plaintiff testified on re-direct that when he went to the clinic he complained of "lack of sleep, indigestion, and hemorrhoids," but not "mental anguish."  Doc. 123-21 at 86.  He testified on re-direct: "When I went to the doctor then, it wasn't because –MRS didn't cause me to go to the doctor when I went to the doctor there."  Doc. 123-21 at 87.

MRS argues that Mr. Weisberg made knowingly false statements and suborned perjury by "prompting" Stovall with questions that affirmatively stated *2011* was the start of the relevant events in the case and by making sure that his client did not make the same mistake at trial that he had made at his deposition, *i.e.*, testifying that the events in the case began in 2010.  MRS argues Weisberg affirmatively represented in his opening statement at trial that MRS started calling Stovall in January 2011 and that Stovall re-routed the Telephone Number from Africa OMS to his computer "at the end of January 2011," even though the 2011 dates did not comport with Stovall's testimony at his deposition.  *See* Doc. 123-16, Plaintiff's Opening Tr. at 5.

Weisberg argues that there was no perjury in this case because Plaintiff did not make any statements at trial that he did not believe to be true, and, under federal law, the required elements that must be proved to establish perjury include "an oath in a case. . . which the declarant does not believe to be true, of a material matter."   Doc. 135 at 8 (quoting 60A Am. Jur. 2d Perjury § 6; see also 18 U.S.C. § 1621).  Weisberg argues that Stovall changed the first collection activity by MRS to 2011 from 2010 at trial because "information gleaned during discovery (including Defendant's call logs and the testimony of Defendant's representative) made reasonably clear that any pre-2011 collection activity on the subject debt had not been performed by Defendant.

Weisberg responds that, in preparing for trial, and comparing the call logs of Defendant MRS with Stovall's "bare recollection" as related in his deposition, "it became clear that if Plaintiff did indeed remember collection activity as early as 2010, such activity was most likely performed by the original creditor on Plaintiff's debt, Educational Resource Institute, and not by Defendant, because Defendant's call logs demonstrated that Defendant's collection campaign did not commence until January of 2011, at the earliest." Doc. 136, Sullivan Decl. ¶¶ 10-21; Doc. 39-14.  Weisberg concedes that he and Plaintiff had "reason to know [the 2010 assertions] to be mistaken and inaccurate," and they did not wish to waste the Court's time with such assertions, thus, they changed the date to 2011. Doc. 135 at 7.  He argues that MRS was free to highlight the inconsistency in Stovall's statements at the deposition and at trial, which is what MRS did at trial.  He argues that discovery helped clarify the timeframe in which MRS, rather than the original creditor, was making calls to Plaintiff's telephone number.  Weisberg argues that *MRS* has not demonstrated that the original collector made no calls to Plaintiff at the subject telephone number before the account was placed with MRS.

The Court finds, based on Stovall's demeanor and testimony at the evidentiary hearing as well as the record before the Court, that Stovall's decision to change his testimony regarding the MRS call and seeing the medic from "2010" to "2011" was done in bad faith.  When confronted with the

weakness of his 2010 claim of having seen the medic, or the unrefuted MRS call log, did Stovall change the dates of the events rather than drop those claims.  To the extent that Weisberg had reason to know the 2010 assertions related to activity by another entity prior to MRS involvement and then prompted Stovall to testify to the activity as happening in 2011 rather than 2010, he knowingly and recklessly pursued which claims which clearly would have been foreclosed and it unreasonably prolonged the litigation of the Harassment Counts.

### B. Telephone Log omitted calls but not marked "redacted"

MRS argues that by redacting certain personal calls from the spreadsheet of the 281 Skype telephone number ("Telephone Log") he provided, Stovall was attempting to hide the fact that he was able to make personal calls at work, since Plaintiff testified that Africa OMS had a policy against employees making or receiving personal telephone calls at work and he testified that he never made personal telephone calls at work.  Doc. 123, Stovall Dep. 25, 33.  MRS contends that it learned for the first time that Stovall had produced a log of telephone calls from the Telephone Number with calls omitted –but not marked "redacted"– when, during the deposition, he was asked about the Telephone Log spreadsheet. Doc. 123-9 at 2; Doc. 136-7 at 4.

When shown a list of telephone calls made to Hawaii, where Plaintiff used to reside, and asked whether the calls were personal or business, he at first testified that "[s]ome were personal, some were work." Doc. 123-2, Stovall Dep. at 34. He later backtracked and said "Actually, no, those phone numbers are not personal." Doc. 123-2 at 34.  Plaintiff also testified to have never called his lawyer while working for Africa OMS.  Doc. 123-2 at 33.  Later in the deposition, however, he testified that there were calls made from the Telephone Number to 888-595-9111, and that these calls were to his attorney, Alex Weisberg.  Doc. 123-2 at 38-39.  When asked about a particular phone call, Stovall responded that "[p]robably, on your copy that would be correct." Doc. 123-2 at 35.  Stovall further testified that before producing the Telephone Log to MRS, he had "blocked out the phone calls that

ha[ve] . . . nothing to do with this, because then, I'm giving out other people's phone numbers without authorization, I can't." Doc. 123-2 at 35.

Because there was nothing obviously "blocked out" on the Telephone Log produced to MRS by Plaintiff, it became clear that Plaintiff had produced an unacknowledged but redacted Telephone Log in discovery, failing to mark it "Redacted" or produce a privilege log. Doc. 123-2, Salvo Decl. ¶ 3. Plaintiff explained at the evidentiary hearing that because the Telephone Number was a Skype number, and he had been forced to assemble the list himself[6]; he testified that he did not include certain phone numbers because he did not want them "to be out there" and he admitted it was "dumb" on his part to do so.

Because Plaintiff's counsel would not agree to turn over the unredacted version of the Telephone Log, MRS was required to serve Plaintiff with a Request to Produce it on May 10, 2012. Stovall's counsel, Mr. Weisberg, resisted and objected to producing it – but failed to produce a privilege log – stating that the request was untimely because it was made three days prior to the close of discovery. MRS filed its Motion to Compel production of the unredacted Telephone Log on July 2, 2013. Doc. 67. The Motion to Compel was granted on July 30, 2012, and Plaintiff was ordered to serve an unredacted copy of the Telephone Log on MRS. Doc. 70; *See* Doc. 123-9 at 4 (unredacted copy - complete list of numbers). MRS contends that many of the telephone calls that were omitted by Stovall were personal calls to his attorney, Mr. Weisberg, which Stovall admitted at trial. Doc. 123, Ex. P, Stovall Tr. at 75-76.

Stovall argues the testimony about the Telephone Log is "confusing because the deposition was taken telephonically. . . and [t]he participants were having trouble over the phone even ascertaining if they were looking at the same document." Doc. 147 at 9. He argues that it is clear that

---

[6]Stovall stated at the hearing that one list had contained all outgoing and incoming calls (with dates through February 28) and the other list had only outgoing calls (with dates through February 24). The difference is immaterial since Stovall has omitted he removed certain calls which were not advantageous to his contention that he was not allowed to make personal calls.

he was not trying to be deceptive, particularly because he volunteered to defense counsel that he had made the redactions and explained why he had done so.  Stovall Dep. at 35.  Thus, he was not hiding the redactions because the list had what he characterizes as "obvious deletions" of telephone numbers on it.  Doc. 147 at 9.   Although Stovall argues[7] that he could not find in the excerpt of the transcript of his trial testimony where he admitted that most of the telephone numbers that were blocked out by him were those of his attorney, on page 75 of the trial transcript excerpt (Doc. 123-20 at 14-15) – precisely the page MRS pointed to – contains Stovall's admission that he edited the Telephone Log[8] and omitted the attorney's phone number from the document numerous times.  Doc. 123-20 at 15.  Stovall argues that he was not trying to do anything sinister, and he produced the unredacted Telephone Log without sanctions well before trial; thus making it possible for MRS to have the Telephone Log available to impeach him.  Doc. 147 at 10.

Weisberg maintains that "[N]obody at [his firm] encouraged, suggested, participated in, or was aware of Plaintiff's removal of information from the first version of the Telephone Log spreadsheet.  Instead, this caught [them] by surprise."  Doc. 135 at 10.  Weisberg argues that unbeknownst to him or his associate (Mr. Sullivan), Plaintiff removed phone numbers from some Skype telephone records listed on the Telephone Log spreadsheet provided to Defendant in February of 2012.  Doc. 135 at 10.  Weisberg contends that the records provided to Defendant in February 2012 did not block out any calls by Plaintiff to Weisberg or his firm.  Mr. Sullivan states in his Declaration that, while Plaintiff did remove certain numbers from the document, he left the calls showing.  Doc. 136, Sullivan Decl. at ¶ 44.  He argues that both the redacted and unredacted versions of the Telephone Log spreadsheets display Weisberg's law firm's toll-free number, 888-595-9111, on whatever calls Plaintiff made to

---

[7]Doc. 147 at 9.

[8]Stovall attempts to argue that there were different versions of the Telephone Log used at the deposition and at trial.  The argument is without merit.

the firm.  He also argues that the Court should be disinclined at this juncture from a sanctions award because the Court chose not to award MRS any fees or costs as a sanction in previously ruling on the Motion to Compel, and that should be the result here.  Doc. 135 at 11.

An enormous disconnect exists between Stovall's representations as alleged by MRS and as described by Weisberg/Sullivan because Mr. Sullivan maintains that he forwarded from Plaintiff to MRS *two* separate Telephone Log spreadsheets containing February 2011 calls and one of the two spreadsheets did contain calls on "February 11, 2011" for example that contained the location of the phone number but not the actual number.  *See* Doc. 136-7 at 3.  Mr. Sullivan subsequently learned that Stovall had removed the phone numbers, but left the calls listed on the spreadsheet.  Doc. 136 ¶ 38. This first spreadsheet is not really in dispute.

Instead, it is the second Telephone Log spreadsheet (Doc. 136-7 at 4) that contained calls between February 3 to February 20 that is in dispute because MRS learned at Stovall's deposition he had decided to omit calls from the spreadsheet.  According to Mr. Sullivan, this second Telephone Log "apparently showing calls received while Plaintiff was logged into Skype on a desktop or laptop rather than using the handset[9]," is delineated as "call_history 2011 to Counsel.xls" (Doc. 136-7 at 4).

Mr. Sullivan contends that MRS misconstrues Plaintiff's trial testimony that "many of the telephone calls that were 'blocked out' by Stovall were personal calls to his attorney, Mr. Weisberg." because MRS is comparison of the two different spreadsheets is like comparing apples and oranges. Plaintiff provided both spreadsheets to the firm in February of 2012, and Mr. Sullivan forwarded both spreadsheets to MRS on February 28, 2012 without any particular notation of any omissions.  Then he contends that the unredacted version of the spreadsheet that was provided to MRS was an unredacted copy of the spreadsheet (Doc. 136-7 at 3–call_history_2011-02(1)[10]) which was simply

---

[9]*See* Doc. 136 ¶ 47.

[10]The unredacted one presented by MRS does not contain a file name at the bottom.

missing several phone numbers ono February 11 and February 24.  Doc. 136 ¶ 47.  Mr. Sullivan is

not only wrong in his representations about *which* of the two spreadsheets was provided unredacted[11],

he is reckless in his sworn representations to this Court on what is an essential issue to the Sanctions

Motion.  The "unredacted version" of the spreadsheet used at the Evidentiary Hearing on the Motion

for Sanctions and used at trial[12] contained calls from February 2 to 28, 2011 and is not the one to

which Mr. Sullivan refers.

     The Court has examined the "redacted and unredacted" spreadsheets presented by MRS and

those presented by Mr. Weisberg and Mr. Sullivan.  Stovall testified that the "unreadacted" version

he finally produced contained all incoming and outgoing calls on the 281 Skype Telephone Number.

However, when the "unredacted spreadsheet" (Doc. 123-9 at 4) is compared to the ones produced

originally in discovery by Stovall – whether two spreadsheets[13] or the single spreadsheet actually at

issue that MRS identifies[14] there are clearly calls that have been completely omitted made on February

2, 4, and 21 to 28.  *See* Doc. 123-9.  These include several calls to Weisberg's toll free number 888-

595-9111 on February 24, 2012.  Based on Stovall's demeanor and testimony at the Evidentiary

Hearing and the Court's review of his testimony at his deposition and the trial, Stovall's omission of

certain calls from the Telephone Log spreadsheet was done in bad faith and to advance his contention

that he was not allowed, and did not, make personal calls on his work Telephone Number.

     Mr. Weisberg, as lead counsel and as supervisor of his associate Mr. Sullivan, was without

reasonable excuse in passing on the altered versions of the Telephone Log spreadsheets to MRS, even

---

[11]Doc. 136-8 at 8, which Mr. Sullivan represents was attached to his email communicating the unredacted list on August 8, 2012, is labeled "call_hisotry_2011-02.csv."  It does not contain calls from February 2, 4, 21, 25, 26, or 28.

[12]*See* Doc. 123-1 (Salvo Decl.) ¶ 15; Doc. 123-9 at 4.  Based on testimony at the Evidentiary hearing, Mr. Sullivan sent out different unredacted versions.

[13]Doc. 136-7 at 3-5.

[14]Doc. 123-9 at 2-3.

though certain phone numbers had clearly been omitted, without further examination or notation. Even at this juncture, post-trial, Mr. Weisberg refuses to admit that one of the Telephone Log spreadsheets omitted Stovall's calls to his firm. The other Telephone Log spreadsheet obviously had phone numbers missing where other calls were listed, yet counsel passed it on to MRS without noting the redactions. After Stovall's deposition, once the omissions were brought to Weisberg and Sullivan's attention, counsel still refused to produce the full, unredacted list. MRS was then required to file a Motion to Compel in order to get Stovall to produce an unredacted Telephone Log. Particularly in light of Mr. Sullivan's representations to this Court in his Declaration (Doc. 136) on this issue, that appear designed to mislead or obscure the extent of Stovall's redactions, the Court finds Mr. Weisberg and Mr. Sullivan's actions to be sanctionable.

### C. *Telephone Number on website for travel agency*

MRS also argues that Stovall committed perjury on the stand regarding the inclusion of the 281 Skype Telephone Number he alleges MRS called in its collection activity, which is the same number on the website for Stovall's Grand Asian Travel (the "Website"). MRS contends that, although Plaintiff admitted that he had created the Website, and during his deposition, acknowledged he was a part owner of Stovall's Grand Asian Travel (Stovall Dep. at 46), Plaintiff unequivocally denied that the Telephone Number was on the Website when it indisputably was. MRS also argues that Plaintiff inconsistently testified at trial that he had re-routed the Telephone Number back to Africa OMS in "the latter part of March, early April" 2011 (Stovall Tr. at 59-60), even though, at his deposition, he testified that he had never re-routed the Telephone Number. Stovall Tr. at 60.

MRS points out that, at trial, Stovall was asked on cross-examination whether he owned a company called Stovall's Grand Asian Travel or whether he was a part owner, to which he testified no. Doc. 123, Ex. P, Stovall Tr. at 60. In his deposition, however, Stovall testified he was part owner of Stovall's Grand Asian Travel. Dep. at 46. At trial, Stovall was also asked whether the website for

Stovall's Grand Asian Travel listed the 281 Telephone Number as its contact telephone number. He testified:

> Q: Isn't it true that if you go to the Stovall Grand Asian Travel website today that that 281 Skype number is listed as the telephone number for Stovall Grand Asian Travel?
> A: Not to my knowledge.
> Q: Didn't you say that you -- at your deposition, you said that you built the website for Africa OMS, didn't you?
> A: Yes, I did.
> Q: So did you build the website for Stovall Grand Asian Travel?
> A: Yes.
> Q: And are you aware that on the internet, that company's website says that it's current as of 2013?
> A: Yes. I would think so, yes.
> Q: And is it your testimony that the Skype [281] telephone number which you said MRS was calling you on is not listed as the telephone number for Stovall's Grand Asian Travel?
> A: That's correct. It's not.

Doc. 123, Ex. P, Stovall Tr. at 61.  However, Stovall's Grand Asian Travel Website did list the Telephone Number as its contact telephone number. Doc. 123, Ex. Q, Salvo Decl.

Following Stovall's testimony concerning the Website and the Telephone Number, and outside the presence of the jury, Judge Antoon showed a copy of the Website to Stovall's counsel. Salvo Decl., ¶ 29.  The Website clearly showed the Telephone Number listed as the contact telephone number for Stovall's Grand Asian Travel.  Prior to closing arguments, Judge Antoon asked Mr. Weisberg what he intended to do, as an officer of the Court, about Plaintiff's testimony. Mr. Weisberg was then given thirty minutes at the recess to discuss it with his client, and subsequently voluntarily withdrew all claims which depended upon Stovall's testimony – the three Harassment Counts. Doc. 136-5, Tr. at 52.  As a result, only the three Voicemail Counts went to the jury.

MRS argues that it could not have been a surprise to Mr. Weisberg that the Telephone Number was on the Website because the Website information had previously been attached as an exhibit to the Defendant's Motion for Summary Judgment, in which Defendant pointed out that the contact telephone number of Stovall's Grand Asian Travel was, in fact, the Telephone Number Stovall alleged

belonged to Africa OMS.  MRS contends that, although Mr. Weisberg knew as early as Defendant's Summary Judgment Motion that the Telephone Number was included on the Website, he allowed Stovall to give false testimony at trial without clarification, even though he asked Stovall questions on re-direct which attempted to "clear up" Stovall's testimony in other areas.

Stovall contends that the reason he testified his travel agency Website did not list the Skype Telephone Number as its contact number, was because he was "not aware of the contents" of Defendant's motion for summary judgment.  When asked if: "that 281 Skype number is listed as the telephone number for Stovall Grand Asian Travel?," he correctly responded: "Not to my knowledge." Stovall Tr. at 61.  Stovall argues that he created the travel Website in December 2010, when he was planning to participate with his wife in the travel business, and he has no recollection of including the Skype number in the web page but admits that it must have been placed there by him at that time.  He argues that he has no recollection of ever looking at that web page after that and had no idea it contained the Skype number.  He argues that he was not in trying to commit perjury, he just did not fully appreciating that saying "not to my knowledge" is much different to lawyers than saying "it is not."  He argues that he made an innocent mistake which does not give rise to bad faith or fraud, and because counsel for MRS persisted in questioning him in order to call his testimony false, it actually helped MRS's case instead of hurting it.

Stovall also contends that when asked at his deposition about transferring the number back, that he testified, "Unfortunately, Mr. Dup [a principal of Africa OMS] passed away," and the company  was not functioning as it needed to.  Dep. at 26.  Plaintiff argues that he was not trying to be deceptive, he was merely trying to explain why he did not follow the plan to transfer the phone back to the OMS secretary initially, in the February time frame. He argues that "the deposition questioning and communication broke down and there was never a clear question about whether he ever thereafter re-routed the phone number back to OMS."  Doc. 147 at 12.  He contends that he

testified truthfully  at trial that he ultimately did transfer the Telephone Number back to Africa OMS

later, but he was tripped up when counsel for MRS asked:

> Q. Isn't it true that your – that in your deposition testimony *you said you never*
> *transferred* the phone number back because a Mr. Dupe, who worked for Africa OMS,
> had died?
> A. That's correct.

Stovall Tr. at 60 (emphasis added by Plaintiff's Memo- Doc. 147 at 12).  Stovall argues that the

question misrepresents what he actually said in the deposition, and counsel for MRS does not cite to

the point in the deposition where he testified he "never" transferred the number back.

The Court finds that Stovall is charged with knowledge of what Telephone Number is

associated with the Website for a company in which he is or was part owner, a Website that he

constructed himself.  In tandem with Stovall's other conduct discussed above, Stovall's denial of the

Telephone Number on the Website was done in bad faith and his conduct is sanctionable.

Mr. Weisberg argues that, prior to trial, he had not been "provided by this Court, or by

Defendant, or by Plaintiff, or by anybody else, with the 2013 screenshot of the Stovall's Grand Asian

Travel Services website" that the Court showed to the him and asked him about at trial. (Sullivan

Decl. ¶ 30).  At trial, after Judge Antoon asked him about the Website, Weisberg conferred with

Stovall and swiftly withdrew the claims that depended on Stovall's assertion that MRS called him on

his work cellular telephone number.  Weisberg argues that Judge Antoon "took him at his word that

he had not seen the Grand Asian Travel Services Website at all prior to trial." Doc. 136-5, Tr. at 52.

However, Weisberg cannot escape the fact that Judge Antoon reserved ruling on the issue of

sanctions.  Within the body of the Motion for Summary Judgment, MRS argued that the Skype

Telephone Number was on the Stovall Grand Asian Travel Website:

> Stovall admittedly owns a travel agency business, Stovall's Grand Asian Travel. The
> website, www.StovallGrandAsianTravelServices.com lists the telephone number for
> that business as the Telephone Number; that is, Stovall's cell phone. So, all customer

calls to Stovall's Grand Asian Travel from the internet would necessarily come in on the Telephone Number.

Doc. 39 at 9-10 (internal citations omitted).  A screen shot of the website was attached as an exhibit to the Summary Judgment Motion of MRS.  Doc. 39-12.  Mr. Weisberg filed a response to the Motion for Summary Judgment.  Doc. 57.

Counsel are charged with the knowledge of what is in the body of the dispositive Motions filed in this Court, particularly if counsel files a Response to the Motion, as Mr. Weisberg did here.  For that reason, Mr. Weisberg's denial of knowledge of the 281 Telephone Number being on the Stovall Grand Asian Travel Website because it was "not provided to him by the Court or Defendant" is a completely unreasonable position, warranting sanctions.

### IV. *Determining the Sanctions Amount*

As set forth above, the Court has found Mr. Weisberg's conduct in the three instances MRS cited was done knowingly and recklessly in pursuit of the Harassment Counts and the damages issue. Mr. Weisberg's conduct vexatiously multiplied the proceedings by lengthening the amount of argument at summary judgment and trial which lasted two days instead of the Court's anticipated one-day projection.  MRS seeks $22,228.40 as a sanction for Mr. Weisberg's conduct, which MRS argues was responsible for vexatiously lengthening the litigation based on three of the six counts.  Ms. Salvo includes time spent drafting the Motion for Summary Judgment ($2,112.50), the Motion to Compel Production of the unredacted telephone log ($2,025); the Opposition to Plaintiff's Motion to Use Deposition Transcript at Trial ($900); Trial preparation ($8,352) and total trial ($1,912); Motion for Sanctions ($6,926).  Doc. 123-23.

Although MRS has submitted an affidavit and an attached invoice of fees (Doc. 123-23), there is no analysis or citation to authority of the total lodestar or calculation of reasonable hours.  Ms. Salvo billed at an hourly rate of $250, however, she has not provided her educational background or

experience, although she obviously provided competent representation defending MRS at trial.  The Court finds that a sanction against Mr. Weisberg for his own conduct, and as the supervisor of Mr. Sullivan, should be $15,000, which would compensate MRS for 60 hours of Ms. Salvo's time at $250/hour, or approximately two times the amount MRS incurred in drafting the Motion for Sanctions (including the trial transcript cost).  Doc. 123-23.

As to the sanction of Stovall, his misrepresentation of dates, hidden redaction of the Telephone Log, and denial that the 281 Telephone Number was moved to another Website he partially owned were done in bad faith, as explained above.  MRS argues that Plaintiff should be liable for the full amount of fees, or $64,100, apparently for *all of the fees in the entire case*, even though much of the case would have proceeded on the three Voicemail Counts, which went to the jury.  Doc. 123-24.

The Court recommends that the same amount of sanctions, **$15,000,** be awarded against Stovall. However, Stovall raised in his brief and at the Evidentiary Hearing his ability to afford the sanction.  When exercising its discretion to sanction under its inherent power, a court must take into consideration the financial circumstances of the party being sanctioned.  *Martin*, 307 F.3d at 1337 (citing *Baker v. Alderman*, 158 F.3d 516, 528-29 (11th Cir. 1998) (imposing sanctions under Civil Rights Act and Rule 11)) and *Byrne*, 261 F.3d at 1098-99 n. 53 (concluding that the district court's consideration of parties' ability to pay sanctions imposed under Rule 11, 28 U.S.C. § 1927, and the court's inherent power was in accord with *Baker*). The inherent power to impose sanctions allows courts to vindicate their judicial authority, but such power must be used to fashion "an appropriate sanction." *Martin*, 307 F.3d at 1337 (citing *Chambers*, 501 U.S. at 44-45). Accordingly, should this Report and Recommendation be adopted, the Court should allow Stovall an opportunity to make a specific showing under *Martin* that might support reduction of the sanction.

**CONCLUSION**

It is respectfully **RECOMMENDED** that sanctions of **$15,000** be awarded against Mr. Weisberg pursuant to 28 U.S.C. § 1927; and that sanctions of **$15,000** be awarded under the Court's inherent authority against Stovall, subject to reduction if he can show that he has an inability to afford such a sanction.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on September 24, 2013.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy